1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                   AT TACOMA

10

11   DAVID BAUMGARDNER, an individual'
     GIMME FIVE D, LLC, a Washington State
     limited liability company; and                      CASE NO. C09-5151RJB
     COMMENCEMENT VIEW, LLC, a
12   Washington State limited liability company,

13                        Plaintiffs,                     **ORDER ON CROSS MOTIONS
                                                          FOR SUMMARY JUDGMENT**
14          v.

15   TOWN OF RUSTON, a fourth class
     municipal corporation; MICHAEL
16   TRANSUE, individually and in his former
     official capacity as Ruston Mayor; HUITT-
17   ZOLLARS, INC., a Texas corporation, and
     CARL STIXROOD, individually and in his
18   official capacity as Ruston Town Planner,

19                        Defendants.

20

21          This matter comes before the Court on Defendants Town of Ruston and Michael

22   Transue's Motion for Summary Judgment Re: Federal Claims (Dkt. 64), Plaintiffs' Motion for

23   Partial Summary Judgment (Dkt. 63), Defendants Huitt-Zollars and Carl Stixrood's Motion for

24   Summary Judgment (Dkt. 57), Defendants Town of Ruston and Michael Transue's Motion for

25   Summary Judgment Re: State Claims (Dkt. 65), Defendants Huitt-Zollars and Carl Stixrood's

26   Joinder in Ruston and Transue's Motion for Summary Judgment (Dkts. 78 and 79), Plaintiffs'

27   Motion to Strike Defendants Huitt-Zollars and Carl Stixrood's Editorial Exhibits 1 and A-C

28

ORDER
Page 1

1  (Dkt. 106), and Defendant Ruston and Transue's motion to strike (Dkt. 95).  The Court has

2  considered the pleadings filed in support of and in opposition to the motions and the file herein.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

**A.   FACTS**

This matter centers around undeveloped property located at 5000 North Orchard Street in Ruston, Washington.  Dkt. 1.  The property is on the west side of North Orchard Street, and so, is in Ruston.  Dkt. 74, at 2.  North Orchard Street is bordered on the east by Tacoma, Washington. Dkt. 67, at 2.  It is an eighteen foot wide paved roadway with curbs and gutters on the Ruston side, but not on the Tacoma side.  Dkt. 67, at 2.  The whole of North Orchard Street in the subject area is controlled by Ruston.  *Id*.  There is no storm water catchment system for North Orchard.  *Id.*

1.   Plaintiffs and Plaintiffs' Tacoma Property on North Orchard Street

Plaintiff David Baumgardner is a real estate developer.  Dkt. 1, at 5.  He is the managing member of the two Washington limited liability companies - Gimme Five D, LLC and Commencement View, LLC - that are named as Plaintiffs in this case.  *Id.*  In 2005, Commencement View, LLC, purchased 10 acres of land on the Tacoma side of North Orchard Street.  Dkt. 68, at 3.  The property was on a "bluff and down along the railroad tracks on Ruston Way," and "is part of the ASARCO 'Super Fund' EPA jurisdiction."  Dkt. 68, at 4.  Three view lots were developed on top of the Tacoma side of the bluff.  Dkt. 68, at 4.  Plaintiffs eventually purchased the subject property which in on the Ruston side of North Orchard Street.  Dkt. 77-4, at 5.  In order to get utilities to Plaintiffs' North Orchard properties (those both within Ruston and Tacoma city limits), Plaintiffs need to get a permit from Ruston.  Dkt. 58-4, at 28.

2.   Ruston

Ruston has a total population of 750 people and occupies about 5 blocks.  Dkts. 69, at 2; 73, at 3.  The mayor is Ruston's land use official.  Dkt. 73, at 3.  None of the few people that work for Ruston have any land use experience.  Dkt. 69, at 2.  In 1995, Ruston contracted with Richard Carothers & Associates ("Carothers") for land use planning related services.  Dkt. 69, at

ORDER
Page 2

2. Defendant Carl Stixrood worked for Carothers when the contract was awarded, and was involved in the bidding and selection process. Dkt. 77-2, at 5-7. The contract, referred to as "Consulting Agreement," provided that Carothers, referred to as the "consultant," would perform "planning, civil engineering, landscape architecture, and surveying services in connection with the general and specific projects by written task order." Dkt. 66-4, at 2. The consultant was to "perform all services and provide all work product . . . within the time limit shown on the specific task order from the date written notice is given to proceed, unless an extension of such time is granted in writing." Dkt. 66-4, at 5. Payment was not to exceed "the amount provided on each specific task order." Dkt. 66-4, at 2. The consultant was to secure a general liability insurance policy, and name Ruston as an insured. Dkt. 66-4, at 3. The consultant was to "perform its obligations with a high degree of professional skill and diligence." Dkt. 66-4, at 3. The contract provides for attorneys fees and costs to a prevailing party who prevails in a suit against the other for enforcement of the contract. Dkt. 66-4, at 4.

Ruston charges fees for land use application review pursuant to RCW 82.02.020. Dkt. 69, at 2. The Ruston Municipal Code provides that Ruston's fees are $150.00 plus consultant and staff costs over one hour. Ruston Municipal Code ("RMC") 1.14.050, in the record at Dkt. 58-4, at 39-37. According to former Ruston Mayor Kim Wheeler, developers have no administrative remedies to challenge fees charged. Dkt. 73, at 9-10.

In 1998, Carothers merged with Defendant Huitt-Zollars, Inc. ("HZ"). Dkt. 69, at 2. According to both HZ and Defendant former Ruston Mayor Michael Transue, who was in office from 1997-2002 and from 2006-2008, HZ assumed Carother's responsibilities under the Consulting Agreement. Dkts. 59, at 2; 58-4, at 6-7; 58-4, at 59-60. Mr. Stixrood was the land use planner, employed first by Carothers and then by HZ, to review land use applications for Ruston. Dkt. 59, at 2. He testified that he was not free to rewrite regulations or make proposals to the mayor or council. Dkt. 58-4, at 4. He testified that he and the other HZ staff members would perform town planning services on an "on-call" or "as directed" basis, but did not come up with projects like a traditional town planner would. Dkt. 58-4, at 4-5. Mr. Stixrood testified

ORDER
Page 3

that he did most of the work for Ruston.  Dkt. 58-4, at 6.  As Mayor, Defendant Transue testified that he did not feel that Mr. Stixrood was an employee of Ruston, but just a consultant.  Dkt. 48-4, at 49.

Mr. Stixrood testified, that in practice, some of the town-initiated projects used task orders, but they were not used for developer's applications.  Dkt. 77-2, at 7.  Mr. Stixrood testified that he believed the rates that HZ charged were in line with the industry standard.  Dkt. 77-2, at 9-11.  He stated that he would record his time as he was doing the work, and put it in a timesheet at the end of the week.  Dkt. 66-37, at 19.

Kevin Foley, Plaintiffs' engineer, stated that he had attended several meetings and Mr. Stixrood did not do a good job of controlling the Town Council meetings or the Planning Commission meetings.  Dkt. 58-4, at 28-30.  Mr. Foley observed that Mr. Stixrood did not try to bring the members back to what they were supposed to be talking about.  Dkt. 58-4, at 28-30.

Mr. Stixrood states that HZ billed Ruston for its services monthly.  Dkt. 59, at 2. Ruston's Town Council approved the bills, and the Town Clerk paid HZ's bills monthly.  Dkts. 58-4, at 53 and 97, at 4.  Ruston generally did not bill an applicant until the review process was complete.  Dkt. 59, at 2.

3.    Subject Property - Ruston Side of North Orchard Street

In April of 2005, Joellen Lewtas Jungers, one of the then owners of the subject property, contacted Mr. Stixrood.  Dkt. 59, at 2.  Mr. Stixrood states that he advised her about the process and possible fees associated with vacating a portion of Court Street, which abutted the subject property.  Dkt. 59, at 2.  He estimated that the cost to have Court Street vacated would be around $2,000 to $4,000.  Dkt. 59-2, at 13.

On June 3, 2005, Mr. Stixrood recommended to the Ruston Town Council that a portion of Court Street be vacated, and that a cul-de sac, at the end of Court Street for emergency vehicle turn around, was "desirable."  Dkt. 59-2, at 21.  The Town Council decided a study session was needed, and directed Mr. Stixrood to examine alternative methods of accommodating an emergency vehicle turnaround.  Dkt. 59-3, at 2.  Mr. Stixrood testified that he drafted different

possible lot configurations (assuming that every piece of ground that could be developed would be developed and nothing else would hinder development), and possible emergency vehicle accesses. Dkt. 58-4, at 14. He drafted "A Supplemental Staff Report," reviewed several options, and recommended that a "fire access loop road" was the best option to provide emergency vehicle access. Dkt. 59-3, at 5-11. He then drafted the Town of Ruston Ordinance 1172, which vacated the contemplated portion of Court Street subject to the condition that a loop turnaround be built. Dkts. 59, at 3; 59-3, at 12-14. Ordinance 1172 was signed by the Mayor of Ruston in July of 2005. Dkt. 59-3, at 12-14.

In September of 2005, Mr. Baumgardner made offered $850,000 for the North Orchard Street Ruston property, contingent on a feasibility study on whether the property could be developed. Dkt. 58-2, at 27. Originally, Mr. Baumgardner and the sellers contemplated November 26, 2005, as the deadline for Mr. Baumgardner's feasibility review. Dkt. 58-2, at 8. This deadline was extended to December 23, 2005, and again to January 17, 2006. Dkt. 58-2, at 9-10. Before he bought the Ruston property, the prior owners gave Mr. Baumgardner the drawings Mr. Stixrood did for Ordinance 1172, which indicated that nine to twelve lots could be developed on the subject property. Dkt. 68, at 5.

On December 30, 2005, Mr. Baumgardner contacted Mr. Stixrood regarding the subject property and inquired about substituting a cul-de-sac for the loop turnaround required in Ordinance 1172. Dkt. 59, at 3. Mr. Baumgardner testified that Ruston's Town Clerk, Karen Murphy, had referred him to Mr. Stixrood. Dkt. 58-3, at 33. Mr. Baumgardner asserts in his declaration that Mr. Stixrood told him that "nine to twelve lots could be built and that the building height restrictions were 30 feet measured from a location that accommodated the steep slope of the property." Dkt. 68, at 5. He states that "these characteristics made the property attractive to [him] as a developer as the more lots that can be developed the higher the potential returns." Dkt. 68, at 5. During his deposition, Mr. Baumgardner testified that he and Mr. Stixrood also discussed a six or seven lot "possibility." Dkt. 58-3, at 11.

Mr. Baumgardner testified that in January of 2006, he had a conversation with Penelope

1   St. John, at HZ, regarding the number of lots possible on the property.  Dkt. 58-3, at 14.  Mr.

2   Baumgardner testified that she referred him to some of the exhibits which were attached to

3   Ordinance 1172, which included several different possible lot configurations, including a

4   possible five lots, six lots, eight lots or maybe nine lots on the subject property.  Dkt. 58-3, at 15-

5   16.  He states that he explored a six lot possibility with her.  Dkt. 58-3, at 17.  On January 10,

6   2006, after that conversation, Mr. Baumgardner sent an email to his real estate agent, stating that

7   he was looking at a three to four lot configuration.  Dkt. 58-2, at 11-12, and 36.  He testified

8   during his deposition that this email was sent during the negotiation process, and that he was

9   "assuming the worst and hoping for the best."  Dkt. 58-3, at 20.  He states that he was relying, in

10  part, on what Baseline Engineering, his engineering firm, was telling him.  Dkt. 58-3, at 27.  Mr.

11  Kevin Foley, of Baseline Engineering, testified that he and Mr. Baumgardner worked on a four

12  lot plan, because the other configurations just did not work.  Dkt. 58-4, at 25-26.

13      In March of 2006, Mr. Stixrood informed Mr. Baumgardner that the mayor had directed

14  HZ not to continue work on questions regarding the subject property until Mr. Baumgardner

15  signed an agreement to pay for services.  Dkt. 58-3, at 53.

16      On April 11, 2006, Mr. Baumgardner signed an "Agreement to Pay for Town Review

17  Services."  Dkt. 59-3, at 22.  This document provides that, "[b]y requesting this action, the

18  applicant agrees to pay the full cost of review regardless of outcome."  Dkt. 59-3, at 22.  The

19  Agreement lists the scope of services to include: "preliminary review per RMC 29.02 and RCW

20  58-17.110 in anticipation of submittal for short plat review and final short plat approval.  This

21  includes review of the proposed cul-de-sac as submitted on 01/09/06 to determine if the solution

22  is feasible."  Dkt. 59-3, at 22.  HZ estimated the labor and materials cost to be $800.00 but

23  cautioned that "the balance due will reflect the actual amount spent."  Dkt. 59-3, at 22.

24      On April 13, 2006, Mr. Baumgardner was informed by Mr. Stixrood that Mr. Stixrood's

25  interpretation of height calculations on steep slopes was incorrect.  Dkt. 59-3, at 27.  Mr.

26  Stixrood testified that the Town Council changed the Code in December of 2005, and it became

27  effective in February of 2006.  Dkt. 66-37, at 27.  Mr. Baumgardner notes that Mr. Stixrood

28

1    helped draft the change in the code regarding building heights.  Dkt. 68, at 9.  Mr. Stixrood

2    stated that he sent Mr. Baumgardner an email to let him know of the change, because they had

3    conversation in 2005 regarding the previous interpretation of the prior code.  Dkt. 66-37, at 27.

4         Concerned that the first contract may have expired, Mr. Baumgardner and the prior

5    owners renegotiated the deal for the Ruston property on April 24, 2006, and dropped the

6    purchase price to $827,500.00.  Dkt. 58-2, at 41.  The deal did not close for several months.  Dkt.

7    77-4, at 5.

8         Michael Robinson, Plaintiffs' real estate agent, testified that he had a conversation in

9    April of 2006 with Mr. Baumgardner about Mr. Stixrood's drawings which were submitted with

10   Ordinance 1172.  Dkt. 77-2, at 40.  Mr. Robinson testified that Mr. Baumgardner told him that

11   the vacation of Court Street was done without "topo or geo" and that "Stixrood has lots off hill."

12   Dkt. 77-2, at 40.  Mr. Robinson further testified Mr. Baumgardner felt that the loop road design,

13   from Ordinance 1172, could not be utilized.  Dkt. 77-2, at 40.

14        Kevin Foley, of Baseline Engineering, testified that in June of 2006, he and Mr.

15   Baumgardner had settled on a hammerhead turnaround for emergency vehicles.  Dkt. 77-3, at 31.

16   He testified that his firm had prepared a conceptual drawing of the hammerhead turnaround

17   which was submitted to Ruston and HZ before passage of Ordinance 1200, which mandated the

18   hammerhead turnaround.  Dkt. 77-3, at 32.

19        Mr. Stixrood states that by July of 2006, he was discussing three approvals with Mr.

20   Baumgardner, including the fire turn around, variance from height requirement and lot

21   segregation approval, rather than the single approval referenced in the April 11, 2006,

22   "Agreement to Pay for Town Review."  Dkt. 59, at 4.  On July 19, 2006, in his letter to Mr.

23   Baumgardner, Mr. Stixrood informed him that the "processing costs for a variance requests are

24   typically in excess of $5,000," and that the "costs of segregation review would be charged to the

25   applicant."  Dkt. 59-3, at 28-29.  Mr. Baumgardner states that Mr. Stixrood "kept pushing for a

26   subdivision proposal" which Mr. Baumgardner contends was not necessary because the property

27   was already platted.  Dkt. 68, at 11.  Mr. Stixrood contends that he was encouraging this because

28

ORDER
Page 7

1   it was cheaper.  Dkt. 92, at 7.

2        On July 26, 2006, HZ sent Mr. Baumgardner a summary of charges as of July 22, 2006,

3   for $2,272.14.  Dkt. 59-3, at 31.  HZ acknowledges that this is more than the original estimate of

4   $800.00.  Dkt. 59-3, at 31.

5        On July 27, 2006, Plaintiffs filed a petition with Ruston to vacate an alley and all of

6   Orchard Street to the east of the subject property, and to change the emergency vehicle access

7   required in Ordinance 1172.  Dkt. 74-2, at 9.  Mr. Baumgardner states that Mr. Stixrood's loop

8   turn around emergency vehicle access proposal, in Ordinance 1172, could not be built as drawn.

9   Dkt. 68, at 6.  He states that the loop was drawn off the bluff.  Dkt. 68, at 6.  Mr. Baumgardner

10  states that he felt that Ruston would want to fix the problems with Ordinance 1172 that he asserts

11  Mr. Stixrood created.  Dkt. 68, at 7.  Mr. Baumgardner states that when he raised the issue with

12  Mr. Stixrood, he was told to submit a proposal to change the loop turn around.  Dkt. 68, at 7.

13  Plaintiffs submitted a drawing of their proposed hammerhead emergency vehicle turnaround.

14  Dkt. 74-2, at 13.  On December 18, 2006, Town of Ruston Ordinance 1200 was adopted.  Dkt.

15  74-2, at 15-22.  Ordinance 1200 vacates the alley and a portion of North Orchard Street

16  requested by Plaintiffs and requires that they dedicate land for a hammerhead emergency vehicle

17  turnaround before any application for a grading permit or lot segregation permit could be

18  approved.  Dkt. 74-2, at 15-22.  Plaintiffs were also required to dedicate land for an

19  approximately ten foot public viewing area with guardrails.  Dkt.  74-2, at 17 ("The 10' -/+ area

20  in Orchard Street right-of-way east of the turnaround shall be available for public access.").

21        On July 27, 2006, Plaintiffs filed an application for a variance from the lot grade

22  definition regarding the calculation of building height.  Dkt 74-2, at 36-48.  Mr. Baumgardner

23  states that rather then recommend Ruston amend Ordinance 1178, regarding building height

24  calculations, Mr. Stixrood recommended that Mr. Baumgardner apply for a variance.  Dkt.  68, at

25  9.  Mr. Baumgardner states that he ended up paying nearly $14,000.00 for a height variance in

26  "an instance where [Mr. Stixrood] led [him] to believe height was not an issue, and where the

27  code could not be met without constructing a subterranean home."  Dkt. 68, at 10.  Mr.

28

Baumgardner states that in addition, his property was then encumbered with restrictions on pruning trees and shrubs.  Dkt. 68, at 10.  Plaintiffs' requested variance from the building height requirements, with conditions addressing protection of vegetation on steep slopes, was approved on October 16, 2006.  Dkts. 74, at 3; 74-3, at 7.

The North Orchard Street Ruston property was finally conveyed from Robert H. Jungers, Joellen Lewtas Jungers, and John Lewtas to Plaintiff Gimmie Five D, LLC, by deed dated August 30, 2006.  Dkt. 77-4, at 5.

On January 24, 2007, Ruston sent Mr. Baumgardner a bill for "professional services" through July 22, 2006, for $2,272.14, and July 23, 2006 through December 23, 2006, for "services provided by Huitt Zollars for variance, definition of fire turn around compliance, ordinance amendment, SEPA review and all public hearings" for $41,254.61, and "administrative costs" for $2,176.33.  Dkt. 66-2, at 2.  Mr. Baumgardner emailed Mr. Stixrood in response and stated that the bill exceeded the $5,000 to $10,000 he agreed to pay.  Dkt. 58-3, at 37.  Mr. Baumgardner notes that when he questioned Mr. Stixrood regarding the bills, he was charged for bill review.  Dkt. 68, at 12.  Mr. Baumgardner complains that he was billed 34 hours by HZ for a "fire turn around drawing."  Dkt. 68, at 13.  He states that he had already submitted a hammerhead turnaround drawing from his experts, so HZ should not have been preparing any drawings.  Dkt. 68, at 13.  Mr. Baumgardner notes that Mr. Stixrood billed for an hour and half to talk with the fire chief, although the fire chief denies ever speaking with Mr. Stixrood for over fifteen minutes.  Dkt. 68, at 13.

Former Mayor Transue states that Mr. Baumgardner complained to him about the bills generated from HZ' work.  Dkt. 97, at 3-4.  Transue states that he referred Mr. Baumgardner to Mr. Stixrood, and also directed the Town Clerk to remove the administrative fee of 5%.  Dkt. 97, at 3-4.  Mr. Baumgardner complained to the Town Council about the bills.  Dkt. 68, at 13-14.

Mr. Stixrood states that while he was involved, Mr. Baumgardner made a total of four separate town actions.  Dkt. 59, at 5.  He states that there were a number of council and/or planning commission meetings related to Mr. Baumgardner's requests.  Dkt. 59, at 5.

1    Former Mayor Transue testified that he felt that Mr. Stixrood was doing the work that

2    Mr. Baumgardner requested.  Dkt. 58-4, at 64-64.  Mayor Transue acknowledges that he never

3    did an audit of HZ, or explore whether they were getting a competitive rate with HZ.  Dkt. 66-

4    38, at 11.

5    On October 19, 2007, Plaintiffs filed a request to prune trees on the steep slope to

6    improve views.  Dkt. 74-3, at 19.  More information was requested by Mr. Stixrood.  Dkt. 74, at

7    3.  Mr. Baumgardner asserts that Mr. Stixrood created "absurd requirements, including his

8    demands that [he] map out every bush, shrub, and tree on [his] property."  Dkt. 68, at 11.  Mr.

9    Baumgardner states that after HZ's contract was terminated in 2008, he provided the Town

10   Council a picture rather then these drawings, and his tree pruning request was approved.  Dkt.

11   68, at 12.  Plaintiffs' request was approved in June of 2009.  Dkt. 74-3, at 27.

12   Mr. Foley, Plaintiffs' engineer, testified that in November 2007, he notified HZ and

13   Ruston that there were errors in Ordinance 1200 (the ordinance that vacated Court Street and an

14   alley), soon after he received a copy of Ordinance 1200.  Dkt. 77-3, at 36.   These errors included

15   errors in the legal description and errors as to exhibits.  Dkt. 66-44, at 2.  Baseline Engineering

16   billed Mr. Baumgardner $4,441.25 for its work correcting Ruston's mistakes on Ordinance 1200.

17   Dkt. 66-44, at 5-6.

18   In November of 2007, Mr. Baumgardner paid almost $42,000.00 of the January 24, 2007,

19   bill from Ruston, "under protest."  Dkt. 68, at 13.

20   On December 3, 2007, Carl Stixrood reviewed Plaintiffs' two lot segregation requests, as

21   required by Pierce County, Washington.  Dkt. 74-3, at 41.  Plaintiffs were reminded that their

22   application was not complete; including their failure to meet requirements in Ordinance 1200 for

23   the dedication of the emergency vehicle access right of way.  Dkt. 74-3, at 42.  In 2009, Plaintiffs

24   signed the deed which dedicated a portion of the property for emergency vehicle access.  Dkt.

25   74-3, at 50.  Ruston's Town Council accepted the deed on June 1, 2009.  Dkt. 74-3, at 51.  After

26   Plaintiffs provided a tax affidavit (on June 19, 2009), Ruston filed the deed which dedicated a

27   portion of the property for emergency vehicle access, on June 22, 2009.  Dkt. 74-3, at 50.

28

ORDER
Page 10

1    Ruston approved the lot segregation on June 24, 2009.  Dkt 74-3, at 25.

2         Defendant Stixrood also responded to Plaintiffs' October 2007 grading permit application

3    on December 3, 2007.  Dkt. 74-3, at 58.  He again reminded Plaintiffs that the application was

4    incomplete absent the dedication of the emergency vehicle turn around and that they had

5    submitted an incomplete grading plan.  Dkt. 74-3, at 58.  The first requirement  - the deed

6    granting the property for the turn around - was fulfilled in June of 2009.  Dkt. 74-5.  Mr.

7    Baumgardner notes that Ruston required a second SEPA review for the grading permit, even

8    though one had already been submitted in the Ordinance 1200 materials.  Dkt. 68, at 12.

9    Plaintiffs completed their grading permit application on July 27, 2009, and on October 7, 2009,

10   the grading permit was issued.  Dkt. 74, at 5.

11        On January 23, 2008, Ordinance 1200 was amended, to correct (according to the

12   language in the Ordinance) "scrivener's errors" discovered by "staff" and the "property owner's

13   representative."  Dkt. 74-2, at 24.  Mr. Baumgardner states that he paid nearly $20,000.00 for

14   Ordinance 1200 and the amendment.  Dkt. 68, at 8.

15        In June of 2008, Ruston terminated its contract with HZ.  Dkt. 69, at 2.  Ruston then hired

16   Villager Properties Inc. d/b/a/ North Creek Consulting ("North Creek") to provide land use

17   planning, consulting, and services.  Dkt. 74, at 2.

18        On July 31, 2009, at Mr. Baumgardner's request, Rob White, of North Creek, issued an

19   "Administrative Interpretation" regarding Mr. Baumgardner's building height variance approved

20   on October 16, 2006.  Dkt. 74-3, at 2-17.

21        In September of 2009, Plaintiffs submitted an application for a permit to get sewer lines

22   to the property.  Dkts. 74, at 5; 77-3, at 42.  Plaintiffs were informed that they needed to

23   incorporate some changes to their plans and post a bond or execute a cash set-aside agreement.

24   Dkt. 74, at 5-6.  According to Mr. White, of North Creek, as of March 2010, Plaintiffs had not

25   provided the updated plans or completed Ruston's request that they either post a bond or execute

26   a cash set aside agreement before issuance of the permit.  Dkt. 74, at 6.  According to Mr.

27   Baumgardner, Mr. White told him he had to pay a bond to Gig Harbor (another town in Pierce

28

ORDER
Page 11

County, Washington).  Dkt. 68, at 17.  Mr. Baumgardner states that he paid the Ruston clerk the $1,000 bond, and then Mr. White told him that the bond was not big enough.  Dkt. 68, at 17.

Mr. Baumgardner states that every time it rains, "Ruston's water continues to flow over [his] property" and the property has had several substantial landslides as a result.  Dkt. 68, at 16.  Mr. Baumgardner states that as early as 2005, he has been rasing the issue of Ruston's storm water discharge onto his property with Ruston and Stixrood.  Dkt 68, at 14-15.  He states that Mr. Stixrood has run up "huge bills 'researching' storm water."  Dkt. 68, at 15.  He acknowledges that he will be responsible for the storm water issues created by his development, but doesn't think that he should be forced to pay for the solution for Ruston's storm water issues.  Dkt. 68, at 15-16.

Mr. Baumgardner asserts that there is no oversight by Ruston on the bills he receives:  he notes that he gets bills for other people's projects.  Dkt. 68, at 17.  Mr. Baumgardner states that as of March 15, 2010, he has received around $75,000.00 in bills from Ruston.  Dkt. 68, at 19.  He asserts that Ruston would then tack on a 5% administrative fee.  Dkt. 68, at 19.  He alleges that HZ was allowed to generate fees without restraint.  Dkt. 68, at 20.

Karen Carlisle, Ruston's Town Clerk from 2000-2009, states that "the administrative fee at five percent was not based upon actual clerk time spent on the bill, but was a flat rate charged for any bill regardless of actual clerk time spent on processing the application."  Dkt. 72, at 5.  Karen Carlisle states that the fee schedule set in Ruston's Ordinances 951 and 1021 were prepared by Mr. Stixrood and the town's attorney.  Dkt. 72, at 7.

Mr. Baumgardner feels that due to Ruston and HZ's delays, he missed his opportunity to sell both of these properties when the market was considerably better.  Dkt. 68, at 20.   For example, Mr. and Ms. Dan Kuchan explored purchasing Plaintiffs' Tacoma property (4925 N. Orchard Street) in October of 2007.  Dkt. 77-3, at 18.  Offers and counteroffers were made.  Dkts. 77-2, at 45-53.  Mr. and Ms. Kuchan wanted to condition the sale on Mr. Baumgardner's getting utilities to the site within 60 days or forfeiting $150,000.  Dkt. 77-2, at 49-53.  Mr. Baumgardner would not agree.  *Id*.  In the spring of 2008, Mr. and Ms. Michael McLeod

1    explored purchasing the Tacoma property.  Dkt. 77-4, at 10.  Mr. McLeod testified that they

2    decided not to purchase because he and his wife met on site with an architect and were advised

3    that "the site would be very expensive to engineer a foundation that would secure a home on

4    such a very steep slope."  Dkt. 77-4, at 10.  He testified that the timing regarding utilities was not

5    an issue.  Dkt. 77-4, at 11.

6         The current mayor of Ruston, Bruce Hopkins, states that Ruston has incurred many costs

7    in connection with review of Mr. Baumgardner's applications for which they have chosen not to

8    bill him.  Dkt. 98, at 3.  Mayor Hopkins states that Ruston has not made any profit from

9    reviewing his applications.  Dkt. 98, at 4.  He states that if developers like Mr. Baumgardner do

10   not pay their bills, it could bankrupt the town.  Dkt. 98, at 4.

11        **B.    PROCEDURAL HISTORY**

12        On March 6, 2009, Plaintiffs filed this case in Pierce County Washington, Superior

13   Court.  Dkt. 1. Plaintiffs allege that all Defendants have violated their federal and state

14   constitution Due Process rights (both substantive and procedural), have "taken" their property

15   without compensation, and have violated their First Amendment rights.  *Id.*  Plaintiffs make

16   claims for tortious interference with a contract and negligence against all Defendants.  *Id.*

17   Plaintiffs make a breach of contract claim against the HZ Defendants.  *Id.*  They assert that

18   Ruston's failure to deal with its storm water run off amounts to an inverse condemnation or

19   trespass.  *Id.*  Plaintiffs seek damages, injunctive relief, attorney's fees, and costs.  *Id.*

20        Defendants removed this case to this Court based on 28 U.S.C. § 1331 (federal question

21   jurisdiction) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).  Dkt. 1.

22        Parties filed cross motions for summary judgment in March 2010.  Dkts. 57, 63-65, 78-

23   79.  On March 18, 2010, Plaintiffs were ordered to show cause why a pleading filed under seal

24   should not be unsealed.  Dkt. 81.  No responses were filed.  The sealing issue is resolved below

25   in Section II. A.

26        **C.    PENDING MOTIONS**

27             1.    Defendants Ruston and Transue's Motion for Summary Judgment Re:
                    Federal Claims

28

Defendants Ruston and Transue move for summary dismissal of Plaintiffs' federal claims arguing that: 1) alleged violations of state law and negligence are insufficient to establish liability under 42 U.S.C. § 1983, 2) Plaintiffs' takings claims are not ripe, and even if they were ripe, Plaintiffs have not suffered a taking requiring compensation, 3) Plaintiffs' substantive and procedural due process claims should be dismissed because they have identified only two interests that are protected under the due process clause, and they have suffered no deprivation of those interests, 4) Plaintiffs have not shown that their free speech rights have been violated, and 5) Defendant former Mayor Transue is entitled to qualified immunity. Dkt. 64. Defendants HZ and Stixrood jointly move for summary dismissal of Plaintiffs' claims on these grounds.  Dkts. 78 and 79.

2.    Plaintiffs' Motion for Summary Judgment

Plaintiffs move for partial summary judgment against Defendants for "violating their due process rights through unreasonable fees and processes for review services." Dkt. 63. Plaintiffs move for "injunction banning Ruston from enforcement of Ruston Mun. Code 1.14.050 until such time as Ruston complies with state statute to set reasonable rates for review and limit its fees for review to the statutorily authorized categories." *Id.* Plaintiffs move for an order dismissing "Defendant HZ's anti-SLAPP [Washington's Anti-Strategic Lawsuits Against Public Participation] claim with prejudice and for an award of attorneys' fees and the $10,000.00 penalty" for having to defend against the claim. *Id.*

3.    Defendants HZ and Stixrood's Motion for Summary Judgment

Defendants HZ and Stixrood move for summary judgment arguing that:  1)  Plaintiffs' tort claims asserted against HZ are barred by the economic loss doctrine, 2) Plaintiffs' negligence and negligent misrepresentation claims must be dismissed because Plaintiffs cannot establish essential elements of their causes of action, 3) Plaintiffs' claims premised upon alleged errors in Ordinance 1172 are barred by the statute of limitations, 4) Plaintiffs' breach of contract claims against HZ must be dismissed because Plaintiffs cannot identify a specific contract provision that was breached, 5) Plaintiffs' § 1983 and state constitutional claims against HZ and

Stixrood must be dismissed because Plaintiffs cannot establish that HZ or Stixrood were state actors, and 6) Ruston's indemnity claims against HZ and Stixrood must be dismissed because no basis for indemnity exists.  Dkt. 57.

    4.    <u>Defendants Ruston and Transue's Motions for Summary Judgment Re: State Claims</u>

Defendants Ruston and Transue move for summary dismissal of Plaintiffs' state law claims, arguing that: 1) Plaintiffs' state constitutional takings claims should be dismissed because they are either unripe or no takings occurred, 2) Plaintiffs can not show that they have an inverse condemnation claim based upon surface water run off, 3) there is no evidence that Ruston breached the "agreement to Pay for Town Review Services," 4) Plaintiffs' intentional interference with a contract claim should be dismissed because no valid contract existed between Plaintiffs and either the Kuchans or the McLeod, none of the Defendants knew of the potential contracts, Defendants' acts were not designed to induce a breach and there was no breach or disruption of the relationship, 5) Plaintiffs' negligence claims should be dismissed, and 6) Defendant Transue is entitled to discretionary immunity under RCW 4.24.470.  Dkt. 65.

    6.    <u>Motions to Strike</u>

Plaintiffs' move to strike Defendants HZ and Stixrood's Editorial Exhibits 1 and A-C. Dkt. 106.  Defendants Ruston and Baumgardner move to strike several pleadings submitted in support of Plaintiffs' motions and responses (Dkt. 95).

**D.**    **ORGANIZATION OF THIS OPINION**

This opinion will first deal with the Court's March 18, 2010, Order to Show Cause.  Dkt. 81.  Next, the opinion will address the various motions to strike.  Dkts. 95 and 106.  The opinion will then turn to Defendants' joint motions to summarily dismiss Plaintiffs' federal claims (Dkts. 64, 78 and 79) and Plaintiffs' partial motion for summary judgment to the extent that it addresses federal claims (Dkt. 63).  Lastly, the opinion will discuss the propriety of remanding this case to Pierce County, Washington  Superior Court.

## II.    <u>DISCUSSION</u>

**A.**    **SEALING OF DOCUMENTS - STANDARD**

1    Local Fed. R. Civ. P. 5(g) provides,

2    (2) There is a strong presumption of public access to the court's files. With regard
     to dispositive motions, this presumption may be overcome only on a compelling
3    showing that the public's right of access is outweighed by the interests of
     the public and the parties in protecting the court's files from public review....
4    (3) If a party seeks to have documents filed under seal and no prior order in
     the case or statute specifically permits it, the party must obtain authorization
5    to do so by filing a motion to seal or a stipulation and proposed order requesting
     permission to file specific documents under seal. The court will allow parties to
6    file entire memoranda under seal only in rare circumstances. A motion or
     stipulation to seal usually should not itself be filed under seal. A declaration or
7    exhibit filed in support of the motion to seal may be filed under seal if
     necessary.  If possible, a party should protect sensitive information by
8    redacting documents rather than seeking to file them under seal. A motion
     or stipulation to seal should include an explanation of why redaction is not
9    feasible.

10    Parties filed cross motions for summary judgment in March 2010.  Dkts. 57, 63-65, 78-

11   79.  On March 15, 2010, Plaintiffs filed, under seal, a pleading entitled "Exhibit 35 to

12   Declaration of Joan K. Mell" in support of their Motion for Summary Judgment.  Dkt. 76.

13   Plaintiffs did not file a motion to seal this document, nor is there a prior order in the record

14   permitting it to be filed under seal pursuant to Local Fed. R. Civ. P. 5(g).  On March 18, 2010,

15   Plaintiffs were ordered to show cause why that pleading should not be unsealed.  Dkt. 81.

16   Parties failed to respond to the Court's March 18, 2010, Order to Show Cause (Dkt. 81).

17   Accordingly, no showing has been made under Local Fed. R. Civ. P. 5(g).  The pleading entitled

18   "Exhibit 35 to Declaration of Joan K. Mell" (Dkt. 76) should be unsealed.

19          **B.      MOTIONS TO STRIKE**

20          Fed. R. Civ. P. 56 (e) provides that affidavits filed supporting or opposing summary

21   judgment must be "made on personal knowledge, set out facts that would be admissible in

22   evidence, and show that the affiant is competent to testify on the matters stated."

23          Plaintiffs move to strike Defendants HZ and Stixrood's "Exhibit 1 to [HZ's] Reply in

24   Support of Summary Judgment Inaccurate Record References in Plaintiffs Response to [HZ's]

25   Motion" (Dkt. 88, at 15-18).  Dkt. 106.  Plaintiffs move to strike Defendants' HZ's "Exhibit A, B

26   and C to [HZ's] Opposition to Plaintiffs' Motion for Summary Judgment" (Dkt. 90-2, at 1-16).

27   *Id.*

28

1    Plaintiffs' motion to strike (Dkt. 106) should be granted and the pleadings stricken.

2    These pleadings contain inadmissible opinion testimony of legal counsel.  Fed. R. Civ. P. 701

3    and 702.  The exhibits were not relied upon in deciding the pending motions.

4    Defendants Ruston and Stixrood move to strike portions of the Plaintiffs' pleadings.  Dkt.

5    95.  Defendants' motion regarding Plaintiffs' character evidence should be granted insofar as it

6    is offered to show conformity therewith on a particular occasion, Fed. R. Civ. P. 403, and but

7    denied insofar as it is offered to provide general background information.

8    Defendants' motion to strike Plaintiffs' submissions containing opinions on matters of

9    law should be granted.  *See United State v. Poschwaata*, 829 F.2d 1477, 1483 (9th Cir. 1987).

10   Defendants Ruston and Stixrood move to strike portions of Baumgardner's declaration

11   (Dkt. 68) and his attorney, Ms. Mell's, declaration (Dkt. 66) as inadmissible hearsay under Fed.

12   R. Ev. 802.  Dkt. 95.  The motion should be granted as to Mr. Baumgardner's assertions about

13   purported complaints from other developers and assertions that the prior owners were unhappy

14   with Ordinance 1172.  The motion to strike based on hearsay in Ms. Mell's declaration should be

15   granted as to the unverified "timeline" she created.  The motion to strike based on hearsay

16   should be denied in all other respects.

17   Defendants move to strike the Baumgardner Declaration (Dkt. 68) due to lack of personal

18   knowledge.  Dkt. 95.  Defendants' motion to strike should be granted as to the amount of profit

19   HS may have made and Transue's work ethic.  It should be denied in all other respects.

20   Defendants' motion regarding settlement discussions should be granted pursuant to Fed.

21   R. Ev. 408.

22   Defendants' motion to strike (Dkt. 95) irrelevant matters should be granted as to

23   complaints of other developers about other developments, the state auditor performance report

24   relating to eight other counties (to the extent it did not concern Ruston), and the 2006 state

25   auditor's report which did not address land use fees.  It should be denied in all other respects.

26

27   These evidentiary rulings apply to these motions only.  In any event, much of the

28

ORDER
Page 17

1    testimony Defendants seek to strike was not relevant to the questions considered in this opinion

2    and so was not considered.

3        **C.    SUMMARY JUDGMENT - STANDARD**

4        Summary judgment is proper only if the pleadings, depositions, answers to

5    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

6    genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

7    law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the

8    nonmoving party fails to make a sufficient showing on an essential element of a claim in the case

9    on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

10   323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could

11   not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v.*

12   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific,

13   significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P.

14   56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

15   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

16   of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v.*

17   *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

18       The determination of the existence of a material fact is often a close question.  The court

19   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

20   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec.*

21   *Serv., Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of

22   the nonmoving party only when the facts specifically attested by that party contradict facts

23   specifically attested by the moving party.  The nonmoving party may not merely state that it will

24   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

25   to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.

26   Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be

27   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

28

**D.     FEDERAL CLAIMS BROUGHT UNDER 42 U.S.C. § 1983**

"Section 1983 provides remedies for deprivations of rights under the Constitution and laws of the United States when the deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Caviness v. Horizon Community Learning Center, Inc*., 590 F.3d 806, 812 (9th Cir. 2010)(*quoting Gorenc v. Salt River Project Agric. Improvement & Power Dist*., 869 F.2d 503, 505 (9th Cir.1989))(*internal quotation marks omitted*).  The conduct allegedly causing the deprivation of a federal right must be fairly attributable to the State.  *Id.*  The state-action element in § 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id.* (*internal citations omitted*).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Through application of the qualified immunity doctrine, public servants avoid the general costs of subjecting officials to the costs of trial - distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *V-1 Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir. 1997)(*internal citations omitted*).

Plaintiffs make federal constitutional claims against Ruston and former Mayor Transue and private actors HZ and Stixrood.  Dkt. 1.  HZ and Stixrood argue that they are not "state actors" and therefore cannot be held liable for a constitutional violation.  Dkt. 57.  Ruston and Defendant former Mayor Michael Transue do not dispute that they are "state actors" for the purpose of potential constitutional liability under § 1983, but argue that Transue is entitled to qualified immunity.  Dkt. 64.  In order to determine both questions (whether private actors are "state actors" and whether qualified immunity applies), the Court should first reach the question of whether a constitutional right has been violated.  *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 954-55 (9th Cir. 2008)("The first inquiry was whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority.  The second

was whether, under the facts of this case, the private parties, may be appropriately characterized as state actors.")(*internal citations omitted*); and *Pearson v. Callahan*, 129 S.Ct. 808, (2009) (although no longer mandatory, in order to determine whether a government official is entitled to qualified immunity, it is helpful to examine first whether a constitutional violation occurred and then whether if there was a violation whether the rights were clearly established)((*internal citations omitted*). As stated in Section II. D. 1.-4. below, Plaintiffs have failed to show that they have suffered a federal constitutional violation.  Accordingly, no further analysis on either the "state actor" doctrine or the qualified immunity defense is necessary.  *See Villegas*, at 955; and *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This opinion now will address each of Plaintiffs' federal constitutional claims.

### 1.    Takings Claim

Defendants move to dismiss Plaintiffs' federal constitutional takings claim.  Dkts. 64, 78, 79, and 113.  The final Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment applies to the States as well as the Federal Government.  *Chicago B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897).  Plaintiffs challenging government action as uncompensated takings of private property may proceed under one of four theories:  (1) a physical invasion of property, (2) that a regulation completely deprives a plaintiff of all economically beneficial use of property, (3) a general regulatory takings challenge pursuant to *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), or (4) a land-use exaction violating the standards set forth in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).  *McClung v. City of Sumner,* 548 F.3d 1219, 1225 (9th Cir. 2008) (*citing Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 548, (2005).

Plaintiffs acknowledge that they are not basing their takings claim on an assertion that the Defendants' actions have completely deprived them of all economically beneficial use of the property.  Dkt. 100, at 3.  Plaintiffs argue that "this case concerns the physical invasion of [Plaintiffs'] property and the extraction of unreasonable regulations and fees from [their]

development." Dkt. 100, at 3.  Plaintiffs argue that Ruston's requirement in Ordinance 1200,

that they dedicate a ten foot public viewing area (with guard rail) on the top of the slope,

amounts to a "physical invasion" of their property.  Dkt. 100, at 3.  Plaintiffs also base their

takings claim on Ruston's "refusal to remediat[e] its storm water" and on Plaintiffs' allegations

that they were charged unreasonable fees under Ruston's application review fee ordinance.  Dkt.

100, at 2-3.

Defendants argue that Plaintiffs' Fifth Amendment takings claim should be dismissed

because it is not ripe.  Under *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473

U.S. 172 (1985), a Plaintiff's federal takings claim is not ripe until (1) the government entity

charged with implementing the regulations has reached a final decision regarding the application

of the regulations to the property at issue, and (2) the Plaintiff has sought compensation through

the procedures the <u>state</u> has provided for doing so, unless such action would be futile.

Plaintiffs have failed to show that their takings claim, based upon Ordinance 1200's

requirement of a public viewing area, is ripe.  Parties do not contest that passage of Ordinance

1200 was a final land use decision.  Defendants point out that Plaintiffs did not seek redress

through Washington's Land Use Procedures Act ("LUPA").  Dkts. 64, and 113.  LUPA is the

"exclusive means of judicial review of land use decisions" with certain exceptions.  *James v.*

*County of Kitsap*, 154 Wash. 2d 574, 583 (2005).  To have standing to bring a land use petition

under LUPA, the petitioner must have exhausted his or her administrative remedies . . . . [and]

filed for judicial review . . . within 21 days of the issuance of the land use decision."  *Id.*, (*citing*

RCW 36.70C.040(3), .060(2)(d)).  Plaintiffs did not bring a LUPA action to challenge this

decision.  "[A] taking is not complete until compensation for a deprivation has been sought and

denied."  *Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 657 (9th Cir.

2003).  Plaintiff makes no showing that such an action would have been futile.  Plaintiffs'

takings claim, based upon Ordinance 1200's requirement of a public viewing area, should be

dismissed.

Plaintiffs' takings claim based on Ruston's "refusal to remediate its storm water" should

1   also be dismissed as unripe under *Williamson*. Plaintiffs have failed to point to a final decision.

2   Plaintiffs have failed to seek relief from the state court or show that seeking such relief would be

3   futile. To the extent Plaintiffs base their takings claim on Ruston's "refusal to remediate its

4   stormwater" the claim should be dismissed.

5       Plaintiffs' final basis for their takings claim is that they were charged unreasonably high

6   fees under Ruston's land use application review fee ordinance. Dkt. 100, at 2-5. This factual

7   basis for a takings claim is insufficient. As to *Williamson* ripeness, Plaintiffs argue that the

8   application review fees are not really land use decisions, and so are exempt from review under

9   LUPA. Dkt. 63, at 29-30. RCW 36.70C.030(1)(c) expressly exempts claims for "monetary

10  damages or compensation" from the procedures, standards, and deadlines set forth in LUPA.

11  The Washington Supreme Court however, has found that the imposition of impact fees as a

12  condition on the issuance of a building permit was a "land use decision" under LUPA, in a case

13  which merely sought "monetary damages or compensation" for fees charged. *James v. County of*

14  *Kitsap*, 154 Wash. 2d 574, 583 (2005). The Washington Supreme Court held that the imposition

15  of an impact fee was not reviewable unless a party timely challenges that decision within

16  twenty-one days of its issuance pursuant to LUPA. *James*, 154 Wn.2d at 586-87. The dissent

17  argued that a challenge to the government's decision to issue or withhold a permit is distinct from

18  a challenge to the imposition of illegal fees or taxes. *Id*. at 591-94. However, the majority

19  expressly found that the government's decision to exact a fee as a condition for granting the

20  developer's building permit constituted a land use decision and not a revenue decision. *Id*. at

21  583-84. Plaintiffs here argue that impact fees and application fees are different. Dkt. 63, at 29-

22  30. They argue that impact fees are assessed at the time of the land use decision, and are a

23  condition of the decision. *Id.* They argue that application review fees are not conditioned on

24  any land use decision, but are ongoing until the project is complete. *Id*.

25      Plaintiffs' argument that the fees are "ongoing" becomes problematic because, then, these

26  bills are  not "final decisions" as required under *Williamson*. Moreover, Defendants have shown

27  a willingness to adjust the fees in the past, and so it is not wholly clear that each bill was a "final

28

1    decision." Complicating matters, Plaintiffs complain that further action on their applications was

2    halted until they paid the bills.  Dkt. 63.

3           Assuming, without finding, that the LUPA statue does not apply to application and

4    review fees, Plaintiffs fail to address whether other state court remedies are or are not available.

5    Plaintiffs do not address whether a claim could be brought directly under RCW 82.08.020.

6    RCW 82.08.20 permits cities or municipal corporations to collect "reasonable fees from an

7    applicant for a permit or other governmental approval to cover the cost to the city, . . . or other

8    municipal corporation of processing applications, inspecting and reviewing plans, or preparing

9    detailed statements" required by the State Environmental Protection Act ("SEPA").  Plaintiffs

10   make no showing that raising a claim under this statute would be futile.  Additionally, Plaintiffs

11   assert a breach of contract claim here that may result in the relief they request.  Plaintiffs also fail

12   to address whether relief would be futile by asserting a claim under RCW 64.40.050, which

13   provides "[o]wners of a property interest who have filed an application for a permit have an

14   action for damages to obtain relief from acts of an agency which are arbitrary, capricious,

15   unlawful, or exceed lawful authority, or relief from a failure to act within time limits established

16   by law."

17          In any event, even assuming that this claim is ripe under *Williamson*, Plaintiffs fail to cite

18   any authority that the fees charged pursuant application review amount to "takings" requiring

19   compensation under the constitution.  The U.S. Supreme Court has held that user fees do not

20   constitute "takings" requiring just compensation.  *U.S. v. Sperry Corp.*, 493 U.S. 52, (1989).  In

21   that case, the recipient of a claim award from the Iran-United States Claims Tribunal brought suit

22   against the United States for recovery of a fee that the United States charged for him to receive

23   payment of his claim.  *Id.*  The U.S. Supreme Court held that the fee required by statute to be

24   paid to the United States from amount recovered was a user fee rather than an unconstitutional

25   taking.  *Id.*  Here, Plaintiffs chose to request governmental services when they made their various

26   land use applications.  Accordingly, these fees are user fees and no showing has been made that

27   they are "takings."  In *Speery*, the plaintiff argued that the fee could not be considered a user fee

28

ORDER
Page 23

because there had "been no showing that the amount of the deduction approximate[d] the cost of the Tribunal to the United States or [bore] any relationship to Sperry's use of the Tribunal or the value of the Tribunal's services to Sperry." *Id.,* at 393-94.  The Court rejected his argument, holding that a user fee need not "be precisely calibrated to the use that a party makes of Government services." *Id.,* at 394.  "Nor does the Government need to record invoices and billable hours to justify the cost of its services." *Id.*  All that is "required is that the user fee be a 'fair approximation of the cost of benefits supplied.'" *Id.*  There is sufficient evidence in the record here to show, for the federal takings claim analysis only,  that the fee assessments were a "fair approximation of the cost of the benefits supplied."  Plaintiffs' takings claim based upon the fees he has been charged under Ruston's land use application fee statute should be dismissed.

Defendants' motion to summarily dismiss Plaintiffs' takings claim should be granted and the takings claim dismissed.  This ruling does not foreclose Plaintiffs' due process claim, however.  "A challenge to land use regulation may state a substantive due process claim, so long as the regulation serves no legitimate governmental purpose." *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008)(*internal citations omitted*).  This opinion will now examine the motions related to Plaintiffs due process claims.

2.   <u>Due Process Claims</u>

Defendants seek summary dismissal of Plaintiffs' due process claims.  Dkts.64, 78, 79, and 113.  Plaintiffs make a cross motion for summary judgment on their due process claim based upon the fees they were charged under Ruston's application review fee ordinance.  Dkts. 63 and 108.

a.   *Substantive and Procedural Due Process Claims - Protected Interest?*

To state a substantive or procedural due process claim, the plaintiff must show as a threshold matter that a state actor deprived them of a constitutionally protected life, liberty, or property interest. *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).

Plaintiffs argue, in response to Defendants' summary judgment motion, that Mr.

Baumgarder's "substantive due process and procedural due process claims are founded on his fundamental rights to develop his land.  He has protected property interests in his land and his resources.  He has protected interests in reasonable regulatory controls and reasonable regulatory fees."  Dkt. 100, at 6.

i.   <u>Constitutionally Protected Interest in Developing Land ?</u>

Turning first to Plaintiffs argument that they have a fundamental right to "develop [their] land,"  Plaintiffs fail to cite any authority for this extremely general proposition.  In fact, the Ninth Circuit has noted that a landowner does not have an "unconditional right under the taking or deprivation clauses of the federal Constitution to build any particular project he chooses." *Lakeview Development Corp. v. City of South Lake Tahoe*, 915 F.2d 1290 (1990).  Closer examination of the interests that Plaintiffs assert are protected is more helpful.

ii.   <u>Constitutionally Protected Interests Regarding Street Vacation<br>Ordinance and Building Heights Variance?</u>

To the extent that Plaintiffs base their due process claims on the conditions imposed on the street vacation ordinances, Plaintiffs have not shown that they had a protected property interest in avoiding those conditions or the manner in which the streets were vacated.  Further, Plaintiffs have not shown that they had a protected interest in avoiding the conditions placed on their ability to prune trees and shrubs on the steep slope which was a part of the building height variance that they were granted.

"A statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right."  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1165 (9th Cir. 2005).  Ruston has discretion on whether or not to vacate public streets.  *See Puget Sound Alumni of Kappa Sigma v. Seattle*, 70 Wn.2d 222, 227 (1967).  Ruston has the discretion to require property owners who request street vacations to pay for property vacated.  RCW 35.79.030.  The Washington Supreme Court has upheld the payment of cash for vacated street, an exchange of property, and permitted the retention of easements as all part of the "payment" contemplated in RCW 35.79.030.  *Greater Harbor 2000 v. City of Seattle*, 132 Wash.2d 267 (1997).  Similarly, Plaintiffs cite to no authority which would limit Ruston's ability

to grant or deny Plaintiffs' building height variance, including placing conditions on trimming trees and shrubs on the steep slope. "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005).

Even if the condition for a public viewing area, for example, was not authorized by RCW 35.79.030, violation of state law does not necessarily give rise to a constitutionally protected due process interest. *Shanks,* at 1089. The erroneous "assumption that every state law violation invariably gives rise to a substantive due process claim is inconsistent with the principle that substantive due process is not a 'font of tort law' that superintends all official decision making." *Id*. Plaintiffs have not shown that they had a protected due process interest regarding Ruston's decision to grant their request to vacate a portion of Court Street and the alley in exchange for the public viewing area and reservation of the hammerhead emergency vehicle turnaround. This is also true of requirements placed on Plaintiff's request for a variance on building height limitations conditioned upon limitations to pruning trees and shrubs on the steep slope. To the extent that Plaintiffs' claims are based upon street vacation and zoning variances, it should be dismissed.

iii.   Constitutionally Protected Interest in "Reasonable Fees" Under RCW 82.08.020?

Plaintiffs, in their motion for summary judgment and in response to Defendants' motion for summary judgment, also point to RCW 82.08.020, arguing that the state has removed the local jurisdiction's discretion in the amount of fees that can be charged in connection with an application for land use. Dkt. 63, at 15. Accordingly, Plaintiffs contend that they have a protected due process interest in the charge of "reasonable fees" for review of their land use applications. *Id.*

This Court is mindful of the Ninth Circuit's warning that "a federal court should not decide federal constitutional questions where a dispositive non-constitutional ground is available. This rule against unnecessary constitutional adjudication applies even when neither the trial court nor the parties have considered the non-constitutional basis for decision." *City of*

1    *Los Angeles v. County of Kern*, 581 F.3d 841, 846 (2009).  Plaintiffs have not made a sufficient

2    showing that they could not challenge the reasonableness of these fees by simply bringing a

3    claim under the state statute, through breach of contract action, or RCW 64.40.050.

4         That consideration aside, Plaintiffs have not convincingly shown that they have a

5    protected due process interest that results from RCW 82.08.020.  "The Supreme Court has

6    repeatedly held that state statutes <u>may</u> create liberty interests that are entitled to the procedural

7    protections of the Due Process Clause of the Fourteenth Amendment." *Carlo v. City of Chino*,

8    105 F.3d 493, 497 (9th Cir. 1997)(*emphasis added*).  "Property interests are not created by the

9    Constitution but by existing rules or understandings that stem from an independent source such

10   as state law-rules or understandings that secure certain benefits and that support claims of

11   entitlement to those benefits." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164

12   (2005)(*internal citations omitted*).  To have a property interest in a government benefit, "a

13   person clearly must have more than an abstract need or desire for it.  He must have more than a

14   unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Id.*

15   The Ninth Circuit uses a "mandatory language test to determine that state statutes or regulations

16   have created a liberty interest within the meaning of the Fourteenth Amendment."  *Carlo,* at 498.

17   Whether a statute creates a property interest depends on "the extent to which the [governing]

18   statute contains mandatory language that restricts the discretion" of the decision makers.

19   *Thornton*, at 1164.

20        The statutory language here does not contain language that is sufficiently "mandatory" to

21   create a protected due process interest.  The statute permits the collection of "reasonable fees to

22   cover the cost to the city, . . . or other municipal corporation of processing applications,

23   inspecting and reviewing plans, or preparing detailed statements" required by SEPA.  RCW

24   82.08.20.  The phrase "reasonable fees" gives cities a great deal of discretion in the amount of

25   fees they choose to charge, if they choose to do so at all.  The statute uses other generalized

26   language for the services that they are permitted to charge.  The statutory language here does not

27   create "a legitimate claim of entitlement."  To the extent that Plaintiffs base their due process

28

ORDER
Page 27

claims on RCW 82.08.20, their claim should be dismissed.  Plaintiffs' motion for summary

judgment on this issue should be denied, and Defendants' motion to summarily dismiss the claim

on this factual basis should be granted.

iv.  Constitutionally Protected Interest in "Accurate Billing"?

Plaintiffs assert that they have a constitutionally protected interest in "accurate billing."

Dkt. 63, at 15 (*citing Memphis Light, Gas and Water Division,* 436 U.S. 1 (1978)).  In *Memphis*

*Light*, the Supreme Court examined the specific language in the Tennessee statute and state court

decisions regarding the statute.  *Id.*  They held that because the utility could terminate service

only "for cause," the Plaintiffs had a "legitimate claim of entitlement" within the protection of

the Due Process Clause.  *Id.*  Plaintiffs fail to point to a sufficiently specific statute which would

entitle them to "accurate billing" such that they would be entitled to constitutional protection.

v.  Constitutionally Protected Interest in Proper Delegation for City
Planning Services to Private Entity?

Plaintiffs fail to identify a constitutionally protected interest implicated in Ruston's

decision to contract with HZ for land use planning purposes.  Plaintiffs point out that the state

constitution prohibits contracting away the power of taxation, and they assert when Ruston

contracted with HZ to provide these services and then passed the bill on to the applicants, Ruston

had contracted away the power of taxation.  Dkt. 63.  Plaintiffs' argument ignores the undisputed

fact that Ruston paid HZ's bills, and it is the Town Council that made the final decisions on the

land use applications.  Moreover, under Washington law, taxes are defined by their purposes:

they are imposed to raise money for the public treasury.  *Okeson v. City of Seattle,* 150 Wn.2d

540, 551 (2003).  There is no indication here that the fees charged were imposed to raise money

for Ruston's treasury.  Moreover, RCW 82.02.020 allow cities to assess charges to "cover the

cost to the city."  Ruston points out that it paid the bills HZ submitted.  Dkt. 97, at 3.  Plaintiffs

have not shown that these charges were not costs to Ruston.  Plaintiffs' due process claims,

based on this factual basis, should be dismissed.

vi.  Constitutionally Protected Interest in Applications for Grading Permit
and Lot Segregation?

1    Defendants concede that Plaintiffs have a state created protectable due process interest in

2    their  applications for a grading permit and lot segregations.  Dkt. 64, at 16 (*citing Mission*

3    *Springs v Spokane*, 134 Wn.2d 947, 965 (1998)).  Whether there is sufficient evidence of a

4    violation of these interests will be addressed below.

5                  b.    *Due Process Claims - Violation?*

6    Plaintiffs applications for a grading permit and lot segregation were both approved.

7    Dkts. 74, at 5 and 74-3, at 25 respectively.  Plaintiffs argue that it took far too long for their

8    grading permit application and their lot segregation application to be approved.  Dkt. 63.

9    To maintain a substantive due process claim, Plaintiffs must show that Ruston's delays in

10   processing their applications lacked a rational relationship to a government interest.  *North*

11   *Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 485 (9th Cir. 2008).

12   Insofar as the lot segregation application was concerned, Plaintiffs do not meaningfully

13   respond to Defendants' argument that approval of the lot segregation was a county function, and

14   that the county could have acted without Ruston's approval.  Plaintiffs have not shown sufficient

15   evidence in the record to conclude that Defendants violated their due process rights based upon

16   the length of time it took to approve their lot segregation application. To the extent that they base

17   their due process claim on the time it took for approval of their lot segregation application, the

18   claim should be dismissed.

19   Insofar as their due process claim is based upon the time it took to get their grading

20   permit, Plaintiffs' due process claim should be denied.  Plaintiffs' delay in processing due

21   process claim is similar to the Plaintiff's claim in *North Pacifica LLC v. City of Pacifica*, 526

22   F.3d 478 (9th Cir. 2008).  In *North Pacifica* the Ninth Circuit examined a case where the

23   Plaintiff alleged that the City violated its substantive due process rights by repeatedly sending

24   requests for more information that delayed the processing of Plaintiff's land use application.  526

25   F.3d at 485.  The Court found that "the complaint demonstrate[d] that, each time the City sent a

26   request for more information, it explained that it was requesting relevant information it did not

27   have or information that would allow it to conduct a thorough review."  *Id.*  It held that there was

28

1   "a reasonable explanation on the face of the complaint for every delay in the City's eventual

2   approval of the application.  The City's repeated information requests thus did not violate the

3   [plaintiff's] substantive due process rights by making unreasonable requests that delayed the

4   project."  *Id.*  Here, the grading permit was approved soon after Plaintiffs completed their

5   application.  The record indicates that Defendant Stixrood responded to Plaintiffs' October 2007

6   grading permit application on December 3, 2007.  Dkt. 74-3, at 58.  He  reminded Plaintiffs that

7   the application was incomplete absent the dedication of the emergency vehicle turn around and

8   that they had submitted an incomplete grading plan. Dkt. 74-3, at 58.  The first requirement  -

9   the deed granting the property for the turn around - was fulfilled in June of 2009.  Dkt. 74-5.

10   Plaintiffs completed their grading permit application on July 27, 2009, and on October 7, 2009,

11   the grading permit was issued.  Dkt. 74, at 5.  Plaintiffs have not shown sufficient evidence in the

12   record to conclude that Defendants violated their due process rights based upon the length of

13   time it took to approve their lot grading permit.

14          To the extent that Plaintiffs base their due process claim upon Ruston's requirement that

15   they submit another SEPA with the grading permit, the claim should be dismissed.  Plaintiffs

16   have not shown that Ruston's requirement of an additional SEPA violated their due process

17   rights.  The Court has "long eschewed ... heightened means-ends scrutiny when addressing

18   substantive due process challenges to government regulation."  *Shanks v. Dressel*, 540 F.3d

19   1082, 1087 (9th Cir. 2008) (*quoting Lingle*, 544 U.S. at 545).  Accordingly, the "irreducible

20   minimum" of a substantive due process claim challenging land use action is failure to advance

21   any legitimate governmental purpose.  *Id.* "When executive action like a discrete permitting

22   decision is at issue, only egregious official conduct can be said to be arbitrary in the

23   constitutional sense: it must amount to an abuse of power lacking any reasonable justification in

24   the service of a legitimate governmental objective." *Id.*, at 1089.  Plaintiffs make no showing

25   that Ruston's request for another SEPA failed to advance any legitimate public purpose.  The

26   "exceedingly high burden" required to show that Ruston, HZ, or their "employees behaved in a

27   constitutionally arbitrary fashion has not been met here."  *Shanks*, at 1087 (*internal citation*

28

ORDER
Page 30

1  *omitted*).  To the extent Plaintiffs assert these actions as a basis for their due process claim,

2  Defendants' motions should be granted and Plaintiffs' claim should be dismissed.

3         To the extent that Plaintiffs base their due process claim on the time it has taken for

4  Ruston to make a decision on their utility permits, Plaintiffs have made no showing that the

5  additional items Ruston has requested for the permit to be considered "complete" failed to

6  advance "any legitimate public purpose."  Moreover, according to the record, the application is

7  still pending.

8         Plaintiffs procedural due process claim should be dismissed.  To obtain relief on a

9  procedural due process claim, the plaintiff must establish the existence of "(1) a liberty or

10  property interest protected by the Constitution; (2) a deprivation of the interest by the

11  government; [and] (3) lack of process."  *Shanks v. Dressel*, 540 F.3d 1082, 1087, 1090 (9th Cir.

12  2008) (*citing Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir.1993)).  Plaintiffs

13  have failed to show that they have suffered a deprivation of a liberty or property interest

14  protected by the constitution.  Accordingly, Defendants' motion to dismiss their procedural due

15  process claim should be granted.  This opinion will now turn to Plaintiffs' final federal claim.

16                          3.    Free Speech Claims

17         Plaintiffs allege that after Mr. Baumgardner began to complain about the bills from

18  Ruston that were generated by HZ's work, the Defendants retaliated against them, violating their

19  speech rights.  Dkt. 63.

20          "In recognizing one's protected interest in commenting on government officials' actions,

21  we have stated that it is clear that state action designed to retaliate against and chill political

22  expression strikes at the heart of the First Amendment."  *CarePartners, LLC v. Lashway*, 545

23  F.3d 867, 877 (9th Cir 2008) (*internal citations omitted*).  Acts of seeking administrative review

24  of government decisions are protected by the right to petition the government.  *Id.*

25         Mr. Baumgardner's complaints about the size of the bills generated by HZ's work that

26  Ruston sent him were protected political speech.  After Mr. Baumgardner received the bill in

27  January of 2007 for around $45,000, he emailed people at HZ and Mayor Transue.  Dkts. 66-2,

28

1  at 3 and 58-3.  He had conversations with people at City Hall, and with members of the Town

2  Council about the bill. Dkt. 68 at 13-14.  He raised the issue via email and at meetings.  Dkt. 68,

3  at 13-14.  These actions were sufficient attempts to seek review of a governmental decision to be

4  protected by the First Amendment.

5       "A plaintiff alleging retaliation for the exercise of constitutionally protected rights must

6  initially show that the protected conduct was a substantial or motivating factor in the defendant's

7  decision."  *CarePartners*, at 877 (*internal citations omitted*).  "[T]he "burden shifts to the

8  defendant to establish that it would have reached the same decision even in the absence of the

9  protected conduct.  To meet this burden, a defendant must show by a preponderance of the

10  evidence that it would have reached the same decision; it is insufficient to show merely that it

11  could have reached the same decision."  *Id*.

12       "The plaintiffs are required, however, to provide more than mere evidence" that the

13  defendants were aware of their expressive conduct in order to establish a genuine material

14  dispute as to whether retaliation was a substantial or motivating factor.  *Alpha Energy Savers,*

15  *Inc. v. Hansen*, 381 F.3d 917, 929 (2004).  In addition, the plaintiffs must: (I) establish proximity

16  in time between the expressive conduct and the allegedly retaliatory actions; (ii) produce

17  evidence that the defendants expressed opposition to the speech, either to him or to others; or

18  (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false

19  and pretextual.  *Id.*

20       Plaintiffs have failed to show proximity in time between the expressive conduct and the

21  allegedly retaliatory actions or that Defendants' proffered explanations were false and pretextual.

22  Plaintiffs argue that when he complained about the bills, his applications were suddenly

23  "incomplete."  Dkt. 63, at 28.  The two "incomplete" applications were the application for a

24  grading permit and application for lot segregation.  Review of the record shows that they were

25  not complete, in part, because Plaintiffs had not dedicated land for an emergency vehicle access

26  turnaround in compliance with Ordinance 1200.  Plaintiffs make no showing that the

27  applications were, in fact, complete.  They argue that when Mr. Baumgardner refused to pay,

28

1  Defendants retaliated against him by refusing to process his other requests.  Dkt. 63, at 28.

2  Plaintiffs fail to point which request was not processed because he was complaining about his

3  bills.  Moreover, Plaintiff makes no showing that even if Defendants stopped processing his

4  requests that it was because he was complaining about his bills, and not because he was not

5  paying the bills.

6      As to whether Plaintiffs have shown that Defendants opposed his speech, Plaintiffs allege

7  that after complaining about the first bill of $45,000 in January of 2007, Mr. Baumgardner

8  received more charges - that is he was billed for his billing questions.  Dkt. 63, at 27.  Plaintiffs

9  have not shown that being billed for billing questions was in retaliation for the complaints.  It

10  only shows that the HZ Defendants billed for more work done for Plaintiffs.

11     Plaintiffs have failed to show that Mr. Baumgardner's complaints about HZ's bills were a

12  substantial or motivating factor behind Defendants actions.  Defendants' motions to summarily

13  dismiss Plaintiffs' First Amendment claims should be granted.

14     **E.      SUPPLEMENTAL JURISDICTION**

15     Pursuant to 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental

16  jurisdiction over a state law claims if (1) the claims raise novel or complex issues of state law,

17  (2) the state claims substantially predominate over the claim which the district court has original

18  jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction,

19  (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

20  "While discretion to decline to exercise supplemental jurisdiction over state law claims is

21  triggered by the presence of one of the conditions in § 1367(c), it is informed by the values of

22  economy, convenience, fairness, and comity." *Acri v. Varian Associates, Inc.*, 114 F.3d 999,

23  1001 (9th Cir. 1997)(*internal citations omitted*).

24     Here, two of the four conditions in § 1367(c) are present.  This case was removed based

25  on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367(a) (supplemental

26  jurisdiction).  Dkt. 1.  All Plaintiffs' federal claims are dismissed by this order.  Accordingly, the

27  Court has "dismissed all claims over which it has original jurisdiction," and so has discretion to

28

ORDER
Page 33

1    decline to exercise supplemental jurisdiction over the state law claims under § 1367(c)(3).

2    Moreover, the remaining state claims "raise novel or complex issues of state law" under §

3    1367(c)(1).  For example, in order to determine whether Plaintiffs' negligence claim based on

4    violation of RCW 82.02.020 (the state statute allowing cities to charge "reasonable fees" for land

5    use application review), the undersigned would have to definitely determine whether LUPA

6    applies - a determination for which the state court is uniquely suited.  Moreover, the values of

7    economy, convenience, and comity may well be served by this Court's declining to exercise

8    supplemental jurisdiction.  *See Acri* at 1001. State courts have a strong interest in enforcing their

9    own laws.  *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 352 (1988).

10        Although "it is generally within a district court's discretion either to retain jurisdiction to

11   adjudicate the pendent state claims or to remand them to state court," *Harrell v. 20th Ins. Co.*,

12   934 F.2d 203, 205 (9th Cir. 1991), in the interest of fairness, the parties should be given an

13   opportunity to be heard on whether the case should be remanded.  The parties should be allowed

14   to show cause why the remaining state law claims should not be remanded to Pierce County

15   Superior Court.  The parties' responses, if any, should be filed by May 3, 2010.  Parties briefs

16   should not exceed four pages.  Consideration of the parties' responses to the Order to Show

17   Cause should be noted for May 3, 2010.  To the extent Plaintiffs' Motion for Partial Summary

18   Judgment (Dkt. 63) deals with state law claims, it should be renoted for May 3, 2010.  To the

19   extent Defendants Huitt-Zollars and Carl Stixrood's Motion for Summary Judgment (Dkt. 57)

20   deals with state law claims, it should be renoted for May 3, 2010.  Defendants Town of Ruston

21   and Michael Transue's Motion for Summary Judgment Re: State Claims (Dkt. 65) should be

22   renoted for May 3, 2010.  Defendants Huitt-Zollars and Carl Stixrood's Joinder in Ruston and

23   Transue's Motion for Summary Judgment (Dkts. 78 and 79), to the extent these motions apply to

24   state law claims should also be renoted for May 3, 2010.

### III.   ORDER

26        Therefore, it is hereby, **ORDERED** that:

27   •        The Clerk is directed to **UNSEAL** the pleading entitled "Exhibit 35 to Declaration of

1    Joan K. Mell" in support of Plaintiffs' Motion for Summary Judgment (Dkt. 76);

2    • Plaintiffs' Motion to Strike Defendants Huitt-Zollars and Carl Stixrood's Editorial

3    Exhibits 1 and A-C (Dkt. 106) is **GRANTED**;

4    • Defendants Town of Ruston and Michael Transue's Motion to Strike (Dkt. 95) is

5    **GRANTED, IN PART, and DENIED, IN PART,** as stated herein;

6    • Defendants Town of Ruston and Michael Transue's Motion for Summary Judgment Re:

7    Federal Claims (Dkt. 64) is **GRANTED**;

8    • Plaintiffs' federal claims are **DISMISSED**;

9    • Plaintiffs' Motion for Partial Summary Judgment (Dkt. 63) as it pertains to their federal

10    claims is **DENIED** and **RENOTED** to May 3, 2010, as it pertains to state law claims;

11    • Defendants Huitt-Zollars and Carl Stixrood's Motion for Summary Judgment (Dkt. 57) is

12    **GRANTED** insofar as it applies to Plaintiffs' federal claims, and **RENOTED** to May 3,

13    2010, as it pertains to state law claims;

14    • Defendants Town of Ruston and Michael Transue's Motion for Summary Judgment Re:

15    State Claims (Dkt. 65) is **RENOTED** to May 3, 2010;

16    • Defendants Huitt-Zollars and Carl Stixrood's Joinder in Ruston and Transue's Motion for

17    Summary Judgment (Dkts. 78 and 79) is **GRANTED** as to Plaintiffs' federal claims and

18    **RENOTED** to May 3, 2010, as to state law claims

19    • Parties may show cause, if any they have, why this matter should not be remanded to

20    Pierce County, Washington  Superior Court.  Responses, if any, should be filed by May

21    3, 2010, and should not exceed four pages in length.

22    The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel

23 of record and to any party appearing *pro se* at said party's last known address.

24    DATED this 28th day of April, 2010.

25

26    Robert J. Bryan

27    United States District Judge

28